1

2

3

4                           UNITED STATES DISTRICT COURT

5                          NORTHERN DISTRICT OF CALIFORNIA

6

7   SCHLUTER SYSTEMS, L.P.,                    Case No.  23-cv-03856-EMC

8                   Plaintiffs,
                                               **ORDER OF DEFAULT JUDGMENT**
9            v.

10  TELOS ACQUISITION COMPANY 10,              Docket No. 24
    LLC, et al.,
11
                    Defendants.
12
                               **I.      INTRODUCTION**
13

14          In this action, Schluter Systems, L.P. ("Schluter") sued Telos Acquisition Company 10,

15  LLC ("Telos Acquisition") and Telos Brands, Inc. ("Telos Brands") (collectively referred to as

16  "Telos"), alleging that Telos violated U.S. trademark laws.  Schluter makes a line of tile-

17  installation-related products which are a bright orange.  Schluter has a registered trademark for its

18  orange tile-installation products ("the Orange Mark").  Telos began selling virtually and

19  functionally identical orange tile-installation-related products on Amazon.com.  Schluter claims

20  that Telos' products infringe on Schluter's Orange Mark.  When Schluter initially filed suit, Telos

21  responded and the parties engaged in several communications, including an agreement to extend

22  Telos' date to file its answer to the First Amended Complaint ("FAC").  However, Telos never

23  filed an answer and Schluter has been unable to reach them since.  Thus, Schluter filed the present

24  Motion for Entry of Default Judgement ("Motion"), for which Telos acknowledged.

25          Because the Court finds that Telos has infringed on Schluter's Orange Mark, Schluter's

26  Motion is therefore GRANTED.

27                              **II.     BACKGROUND**

28          In this action, Schluter Systems, L.P. ("Schluter") sued Telos Acquisition Company 10,

United States District Court
Northern District of California

LLC ("Telos Acquisition") and Telos Brands, Inc. ("Telos Brands") (collectively referred to as "Telos"), alleging that Telos violated U.S. trademark laws, and other various California state laws and common law provisions. FAC, ¶¶ 1-8. Telos Brands owns Telos Acquisition and directs its operations. *Id*. at ¶¶ 4-5. Both Telos Brands and Telos Acquisition were founded by and are governed and directed by Mr. James Serena. *Id*. ¶ 6.

Schluter markets and makes a line of tile-installation-related products such as tile trims, uncoupling membranes, floor heating systems, waterproof building panels, and shower systems. *Id*. ¶ 15. Schluter's products and advertising are a bright shade of orange, as depicted below. *Id*.



FAC, ¶ 21. Schluter's drainage membrane and waterproof membrane.

In 1990, Schluter began using the color orange in connection with its tile installation products. FAC, ¶ 17. Schluter's orange-colored waterproofing and drainage membranes have been marketed and sold under different Schluter product names, including KERDI, DITRA, and DITRA HEAT. *Id*. ¶ 19. Schluter's products are marketed and promoted through Amazon.com, among other sites. *Id*. ¶ 33; FAC, Ex. C. As of April 10, 2012, Schluter owns a United States Trademark Registration for use in connection with the color orange ("the Orange Mark"). FAC, ¶ 20. Specially, the trademark covers "waterproofing and drainage membranes for use in connection with tile installations." U.S. Patent No. 4,124,207 (filed Apr. 10, 2012), FAC, Ex. A at 1. Schluter has spent "many millions of dollars" promoting the Orange Mark and its related products across the United States. FAC, ¶ 23. "[T]he Orange Mark has become a recognized symbol of Schluter in the world of tile installation products." *Id*. ¶ 21. "Through its continuous use and promotion of the Orange Mark in the United States for nearly 30 years, Schluter has developed and owns significant common law rights to the Orange Mark in connection with

2

products used in connection with tile installations." *Id*. ¶ 22.

Telos markets and promotes a variety of different products, including waterproofing membranes and uncoupling membranes used in tile installation. FAC, ¶¶ 27-28. Telos' products are also called "Snap Products." Telos sells its products "at least on" Amazon.com. *Id*. ¶ 27. "Schluter sells virtually identically colored products that are virtually identical in intended function to Telos' copycat products." *Id*. ¶ 30.

| Telos-Brand | Schluter Product |
|---|---|
| **Waterproof Membrane** | **KERDI** |
|  |  |
| **Uncoupling Membrane** | **DITRA** |
|  |  |
| **Heated Floor Uncoupling Membrane** | **DITRA-HEAT** |

FAC, ¶ 30.

Schluter alleges that "the Orange Mark has become a recognized symbol of Schluter in the world of tile installation products, including in the United States" and that Schluter's customers, tile installation professionals, refer to its products as the "orange products" or "orange stuff." FAC, ¶¶ 21, 24. Indeed, Schluter has provided substantial evidence to this effect. FAC, Ex. C at 4 (in a customer review, a customer called Schluter's product "the orange stuff"); *id*. at 6-9 (a customer, Bill Gagne wrote a blog post comparing Schluter's waterproofing products to another company's, Wedi. Mr. Gagne titled the blog post "Blue vs Orange: What waterproofing system is better?" and he concluded, "the big orange monster of waterproofing isn't as good as the Wedi");

United States District Court
Northern District of California

*id.* at 10 (in a blog post titled "Why Schluter Ditra is so cool: Uncoupling membranes explained," the author called Schluter's product the "orange waffle-y" product).

Schluter has provided evidence that customers have bought Telos' products, mistakenly believing that Telos' products were Schluters'.  FAC, Ex. D. at 7-8, 16-17, 25-26 (in a customer review on one of Telos' products, a customer stated, "They are selling this as Schluter it should be taken out.  They should specify this is not Schluter but an imitation" (cleaned up)); Reply, Ex. B. at 5-7 (in a customer review on one of Telos' products, customers stated "For the price this material [is] inferior to the Schluter product.  My tile contractor had already installed this product before I noticed.  We had some left over Schluter from [a] previous project and [there is a] significant difference. …" "I don't know where I went wrong. I was shopping for the real thing and then I must have saw what I thought was the same product for $20 cheaper and I went for it.  I was buying the 320+ ft roll so the money was only a 6% savings.  I would have not done it. ..."); Madonna Decl. ¶ 6, Docket No. 24 (a Schluter employee stated: "We have received requests from consumers who have purchased non-Schluter product believe[ing] it was Schluter product because it was colored orange.").

A.      The Parties' Communications

In September of 2022, Schluter sent Telos a cease-and-desist letter informing it of Schluter's claims, but Telos did not respond.  FAC, ¶ 46.[1]  On August 1, 2023, Schluter filed suit. Subsequently, on September 11, 2023, Schluter filed its FAC.  Docket No. 11.  In response, the (then) CEO of Telos, James Serena, communicated with Schluter and indicated a willingness to settle the dispute.  After a phone call between the parties, Mr. Hansen sent an email to Mr. Serena following up.  Hansen Decl., Ex. A at 3.  Mr. Hansen stated:

> Thank you for the call this morning.  Below is a list of the items we discussed.
> …
> 2. We understand you were aware of Schluter and its patents previously.
> …

---

[1] After suit was filed, Mr. Serena emailed Mr. Hansen informing him that he "did not receive the cease-and-desist letter sent last year, so this is the first [he was] hearing of the complaint."  Hansen Decl., Ex. A at 4, Docket No. 24.

United States District Court
Northern District of California

4

> 5. You are considering whether or not to engage legal counsel to help resolve the matter.  If you do, please have them contact us.

*Id*.  Mr. Serena emailed back:

> Thanks Jed, confirming receipt and appreciate again the time this morning.  I'll get working on the action items on my side and circle back with an update at the end of the week.

*Id*. at 2.

On October 3, 2023, the parties stipulated to an extension of time for Telos to respond to the FAC.  Docket No. 15.  In Mr. Hansen's email to Mr. Serena, he copied the stipulation he sought to file with the Court, asking for Mr. Serena's approval before he filed the stipulation. Hansen Decl., Ex. A at 2.  Mr. Hansen stated:

> Note that we have added a section that waives formal service of the Complaint on Telos Acquisition Company.  As Telos Brands has already been served, we did not view this as controversial and wanted to make it clear to the Court that the extension is for both entities.

*Id*.  Mr. Serena responded affirmatively.  *Id*. at 1.

Schluter and Mr. Serena also discussed Telos changing its products to brown, but that change was never made on Amazon.com.  *See* Hansen Decl., Ex. C-E, Docket No. 24. Additionally, Schluter asked Mr. Serena to provide an accounting to Schluter.  Mr. Serena communicated to Mr. Hansen that Telos had sold an estimated 9,000 to 10,000 rolls of product from the website.  Mot., Ex. C at 3 ("it's looking to be in the range of 9,000-10,000 rolls total, potentially a little shy of that.").

On November 6, 2023, Mr. Serena informed Schluter that "there is now a new owner of the business," Marc Roca.  Mot., Hansen Decl. ¶ 7.  Subsequently, Mr. Roca communicated with Schluter indicating that he was going to "liquidate assets and shut down [Telos]" and that the company was "bankrupt."  *Id*. ¶ 9.  However, Mr. Roca subsequently represented that "the contemplated transaction had not occurred."  *See* Ex. 2. Docket no 24.  On November 17, 2023, Mr. Roca emailed Schluter's counsel, Mr. Jed Hansen:

> Jed, the request has been made to Amazon already to shut down the storefront page, this is not immediate from their side, we are following every 48 hours.

United States District Court
Northern District of California

1

> The LLC has no cash and no assets, it actually has other creditors that are owed money and no one is getting paid, any involvement of the court will be a waste of money.  The Telos parent company defaulted on their loan and did a chapter 9.

2

3

> This will all be resolved before the end of the year and the business shut down.

4

5   Hansen Decl., Ex. G at 1, Docket No. 24.

6       After Telos failed to file an answer to Schluter's FAC, Schluter requested the Clerk to

7   enter Default Judgment.  On December 4, 2023, Mr. Serena acknowledged receipt of Schluter's

8   request for the Clerk's Default Entry and supporting papers.  Hsien Decl. ¶ 5, Docket No. 24.

9   Indeed, Keith Vittori, a paralegal for Schluter's counsel, emailed Mr. Serena:

10

> Please see attached documents to be filed in the above caption case – 1) Request for Default, 2) Hansen Declaration in Support of Request for Default, and 3) Proposed Default.

11

12  Hsien Decl., Ex. 3 at 1.  Mr. Serena replied:

13

> Thanks Keith, copying in Marc who owns the business now.

14

15  *Id*.  Subsequently, Mr. Vittori emailed the same documents to Mr. Marc Roca.  Hsien Decl., Ex. 2

16  at 1.  Mr. Roca replied:

17

18

> I am no longer involved in any of this as my transaction was never fully executed and thus canceled from our side at the end of the year, due to James Serena not transferring the accesses and information we needed to resolve this or take over the management of the assets.

19

20

> James Serena still has all the master accesses and he can take care of this.

21

22

> Good luck to all, please do not contact me again about any Telos matter.

23

24  *Id*.  Since then, Telos has not otherwise responded to this action.

25       In a status conference on January 9, 2024, the Court discussed with Schluter its filing of

26  the present Motion.  Docket No. 23.  The Court stated: "Plaintiffs should maximize the chances of

27  reaching the parties for notice, and Plaintiffs must submit a declaration to this effect."  *Id*. at 2.

28  Schluter subsequently submit a declaration stating they had served process via email on Mr.

United States District Court
Northern District of California

6

Serena, the agent for service of process for Telos, and Mr. Roca, and they had attempted service of process via a process server to three physical addresses: the address on record with the U.S. Patent and Trademark Office (for a different trademark), the address listed on several corporate filings from Telos (though the process server was told "Telos moved out more than a year ago"), and a business address for Mr. Serena (though the process server was told that Telos was not there). Ren Decl., ¶¶ 4-9, Docket No. 24.  Schluter has not received a response from Telos.

The Court asked Schluter to provide recent evidence of their continuing need for a permanent injunction, given that Telos represented months ago that it would take its products off Amazon.com.  Schluter provided evidence that Telos' products are still on Amazon.com, though they are marked as "currently unavailable."



Ex. A at 1, Docket No. 28.  Schluter states: "While at the present time, it does not appear that a consumer may not purchase the Accused Product on Defendants' Amazon webpage, the listing remains on Amazon.com.  Meaning, at any point in time in the future, the product may become available and product sales may resume."  Docket No. 28 at 2.

Schluter asserts several causes of action: federal trademark counterfeiting, federal trademark infringement, federal trademark infringement and unfair competition, California unfair competition, California false advertising, California common law trademark infringement, California common law unfair competition.  FAC at 9-14.  Schluter states "claims for trademark counterfeiting and state and common law trademark infringement and unfair competition under Cal. Bus. & Prof. Code § 17200 are 'subject to the same test' as trademark infringement."  Mot. at 10 (citing *Moroccanoil, Inc. v. Allstate Beauty Products, Inc.*, 847 F.Supp.2d 1197, 1201 (C.D.

United States District Court
Northern District of California

Cal. 2012) (citing *Jada Toys v. Mattel, Inc.*, 518 F.3d 628, 632 (9th Cir. 2008)).  Further, in

Schluter's Motion, it does not mention a false advertising claim, so that claim is waived with

respect to this Motion.  Thus, the following Order solely discusses Schluter's trademark

infringement claim under the Lanham Act.

### III. <u>DISCUSSION</u>

A.    <u>Service of Process</u>

"As a preliminary matter, the Court must first assess the adequacy of the service of process

on the party against whom default is requested."  *Bd. of Trs. v. James Island Plastering, Inc.*, 2020

WL 1156903, at *3-4 (N.D. Cal. 2020) (internal quotation marks omitted).  Here, there is no

question of service of process as Defendants agreed they were served.  In Mr. Hansen's email to

Mr. Serena, Mr. Hansen copied the stipulation he sought to file with the Court, asking for Mr.

Serena's approval before he filed the stipulation.  Hansen Decl., Ex. A at 2.  Mr. Hansen stated:

> Note that we have added a section that waives formal service of the
> Complaint on Telos Acquisition Company.  As Telos Brands has
> already been served, we did not view this as controversial and
> wanted to make it clear to the Court that the extension is for both
> entities.

*Id*.  Mr. Serena responded in the affirmative, confirming that Telos was served.  *Id*. at 1.

Additionally, though it is unclear who owns Telos, both purported owners confirmed

receipt of Schluter's entry of default judgment.  Mr. Vittori, a paralegal for Schluter's counsel,

emailed Mr. Serena:

> Please see attached documents to be filed in the above caption case
> – 1) Request for Default, 2) Hansen Declaration in Support of
> Request for Default, and 3) Proposed Default.

Hsien Decl., Ex. 3 at 1.  Mr. Serena replied:

> Thanks Keith, copying in Marc who owns the business now.

*Id*.  Subsequently, Mr. Vittori emailed the same documents to Marc Roca.  Hsien Decl., Ex. 2 at 1.

Mr. Roca replied:

> I am no longer involved in any of this as my transaction was never
> fully executed and thus canceled from our side at the end of the
> year, due to James Serena not transferring the accesses and

1    information we needed to resolve this or take over the management
     of the assets.

2    James Serena still has all the master accesses and he can take care of
     this.

3

4    Good luck to all, please do not contact me again about any Telos
     matter.

5    *Id*. Thus, it is clear that Telos is on notice of the suit and Schluter's pursuit of Entry of Default.

6         Additionally, in accordance with the Court's directive, Schluter also served the Motion on

7    each address it could find that was in any way connected with Telos, to no avail. Schluter submit

8    a declaration stating it had served process via email on Mr. Serena, the agent for service of process

9    for Telos, and Mr. Roca, and it had attempted service of process via a process server to three

10   physical addresses: the address on record with the U.S. Patent and Trademark Office (for a

11   different trademark), the address listed on several corporate filings from Telos (though the process

12   server was told "Telos moved out more than a year ago"), and a business address for Mr. Serena

13   (though the process server was told that Telos was not there). Ren Decl., ¶¶ 4-9, Docket No. 24.

14   During the March 21, 2024 hearing, Schluter represented that it had served this Motion on Telos at

15   several possible addresses and at Mr. Serena's email address. Thus, Schluter has made every

16   reasonable effort to inform Telos of this case and the Motion.

17   B.    <u>*Eitel* Factors</u>

18        The Court now turns to whether default judgment is warranted on the merits. Under

19   Federal Rule of Civil Procedure 55(b)(2), a court may enter default judgment after the clerk has

20   already entered a party's default. Fed. R. Civ. P. 55(a)-(b).

21        Upon default, "all well-pleaded allegations regarding liability are
          taken as true, except with respect to damages." *DiscoverOrg Data,*
22        *LLC v. Bitnine Global, Inc.*, No. 19-CV-08098-LHK, 2020 WL
          6562333, at *2 (N.D. Cal. Nov. 9, 2020). However, a court still may
23        conduct hearings or make referrals where needed to "establish the
          truth of any allegation by evidence, or investigate any other matter."
24        Fed. R. Civ. P. 55(b)(2).

25   *Bungie, Inc. v. Thorpe*, 2023 WL 2145522, at *7-8 (N.D. Cal. 2023). "[D]efault judgments are

26   ordinarily disfavored." *Eitel v. McCool*, 782 F.2d 1470, 1471 (9th Cir. 1986). "The district

27   court's decision whether to enter a default judgment is a discretionary one." *Aldabe v. Aldabe*,

28   616 F.2d 1089, 1092 (9th Cir. 1980). A court may consider the following factors in exercising its

United States District Court
Northern District of California

discretion:

> (1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's substantive claim[s], (3) the sufficiency of the complaint, (4) the sum of money at stake in the action[,] (5) the possibility of a dispute concerning material facts[,] (6) whether the default was due to excusable neglect, and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits.

*Eitel*, 782 F.2d at 1471-72.

### 1. First Factor: the Possibility of Prejudice to the Plaintiff

As to the first factor, if the Motion were to be denied, then Schluter would likely be prejudiced as it would be left without a remedy. *See Walters v. Shaw/ Guehnemann Corp.*, 2004 WL 1465721, at *7 (N.D. Cal. 2004) ("To deny plaintiff's motion [for default judgment] would leave them without a remedy. Prejudice is also likely in light of the merits of their claims."); *Pepsico, Inc. v. Cal. Sec. Cans*, 238 F. Supp. 2d 1172, 1177 (C.D. Cal. 2002) (same). Schluter will be unable to otherwise prevent Telos from infringing on its Orange Mark. Though Telos' Amazon webpage currently says its product is "currently unavailable," if it reactivates its Amazon page, Schluter will likely be unable to stop confusion in the marketplace, lose revenue, and its reputation in the marketplace would likely take a hit.

### 2. Second Factor: the Merits of Plaintiff's Substantive Claims

"To prevail on [a] Lanham Act trademark claim, a plaintiff must prove: (1) that it has a protectible ownership interest in the mark; and (2) that the defendant's use of the mark is likely to cause consumer confusion." *Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1202 (9th Cir. 2012) (internal quotation marks omitted). Additionally:

> The validity of a trademark is a "threshold issue," as "[a] necessary concomitant to proving infringement is, of course, having a valid trademark; there can be no infringement of an invalid mark." *Yellow Cab Co. v. Yellow Cab of Elk Grove, Inc*, 419 F.3d 925, 928 (9th Cir. 2005). … [W]here a plaintiff pursues a trademark action involving a registered trademark, the burden of proving the invalidity of the trademark falls on the defendant." *Applied Info Scis. Corp.*, 511 F.3d at 970; *see also Yellow Cab Co.*, 419 F.3d at 927). The defendant can only overcome the registered mark's presumption of validity by showing by a preponderance of evidence that the mark is not protectable. *Zobmondo Entm't, LLC v. Falls Media, LLC*, 602 F.3d 1108, 1114 (9th Cir. 2010).

1    *Macy's Inc. v. Strategic Marks, LLC*, 2016 WL 374147, at *3 (N.D. Cal. 2016).

2              a.    Element One: Plaintiff has a Protectible Ownership Interest in the Orange

3                    Mark

4          On element one of the *Rearden* test, Schluter has alleged that it is the current owner of the

5    trademark.  *See* FAC ¶ 33.  There is nothing in the record to suggest otherwise.  *See Rearden*, 683

6    F.3d at 1203 ("To acquire ownership of a trademark it is not enough to have invented the mark

7    first or even to have registered it first; the party claiming ownership must have been the first to

8    actually use the mark in the sale of goods or services.  Therefore, a party pursuing a trademark

9    claim must meet a threshold use in commerce requirement.") (internal quotation marks omitted).

10   Schluter started using orange with the promotion of its flooring membranes in 1990.  FAC ¶¶ 22-

11   23.  Further, Schluter registered the trademark with the USPTO.  *See* FAC ¶ 33.  "'[F]ederal

12   registration provides 'prima facie evidence' of the mark's validity and entitles the plaintiff to a

13   'strong presumption' that the mark is a protectable mark."  *Zobmondo Entm't, LLC v. Falls Media,*

14   *LLC*, 602 F.3d 1108, 1113 (9th Cir. 2010).

15         After a phone call between the parties, Mr. Hansen sent an email to Mr. Serena listing the

16   items the parties had discussed.  Hansen Decl., Ex. A at 3.  Mr. Hansen stated: "We understand

17   you were aware of Schluter and its patents previously."  *Id*.  Mr. Serena emailed back: "Thanks

18   Jed, confirming receipt and appreciate again the time this morning."  *Id*. at 2.  This exchange at

19   least suggests that Mr. Serena (and therefore Telos) acknowledges that Schluter has a protectible

20   interest in its mark.

21         Though the record shows that Schluter has a protectible ownership interest in the Orange

22   Mark, a question still arises as to whether the Orange Mark is a valid trademark.  *Macy's*, 2016

23   WL 374147, at *3 (the defendant has the burden of proof, by a preponderance of the evidence, to

24   overcome the mark's presumption of validity if it is registered).  Here, the underlying principles of

25   trademark law require (1) that the mark "identify and distinguish [the seller's] goods … from

26   those manufactured or sold by others and to indicate [their] source," 15 U.S.C. § 1127, and (2) that

27   it not be "functional," *see*, *e.g.*, *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844,

28   850, n.10 (1982).

United States District Court
Northern District of California

11

On element one, whether the mark "identif[ies] and distinguish[es] [the seller's] goods," the question is whether the Orange Mark "has developed 'secondary meaning.'" *Qualitex Co. v. Jacobson Products Co., Inc.*, 514 U.S. 159, 163 (1995). "Secondary meaning" is acquired when "in the minds of the public, the primary significance of a product feature … is to identify the source of the product rather than the product itself." *Id.* (quoting *Inwood*, 456 U.S. at 851, n.11). Color can provide this function. *See Qualitex*, 514 U.S. at 159 ("The Lanham Act permits the registration of a trademark that consists, purely and simply, of a color."); *see also In re Owens-Corning Fiberglas Corp.*, 774 F.2d 1116 (Fed. Cir. 1985) (holding that the color "pink" as a trademark for manufacturer's fibrous glass residential insulation was valid when the pink color gave "the public a reliable indication of source and thus facilitate[d] responsible marketplace competition.") (quoting *Levi Strauss & Co. v. Blue Bell, Inc.*, 632 F.2d 817, 821 n.5 (9th Cir. 1980)). Here, it is evident that Schluter's orange-colored products have developed a "secondary meaning" because the orange color "identif[ies] and distinguish[es] [the seller's] goods." *Qualitex*, 514 U.S. at 163. Schluter contends that "[a]s a direct result of Schluter's extensive use of its Orange Mark, the Orange Mark has acquired secondary meaning and has become a valuable marketing business asset of Schluter which signifies to the consuming public the standard of quality of products originating exclusively from Schluter." FAC, ¶ 25.[2]

On element two, whether the mark is "functional," the mark should *not* be a "useful product feature" such that permitting a trademark would "inhibit[] legitimate competition." *Qualitex*, 514 U.S. at 164. A product feature cannot serve as a trademark "'if it is essential to the use or purpose of the article or if it affects the cost or quality of the article,' that is, if exclusive use of the feature would put competitors at a significant non-reputation-related disadvantage." *Id.* at 165 (quoting *Inwood*, 456 U.S. at 850, n.10). In *Qualitex*, the Supreme Court found that dry cleaning pads that were manufactured with "a special shade of green gold" were trademarkable in part because the color was not-functional ("although it is important to use *some* color of press pads to avoid noticeable stains, the [district] court found 'no competitive need in the press pad industry

---

[2] *See* Schluter and Telos' customer reviews referring to Schluter products as "orange." FAC, Ex. C at 4 ("the orange stuff"); *id.* at 6-9 ("the big orange monster of waterproofing").

for the green-gold color, since other colors are equally usable."). *Id.* at 159, 166. *See also*

*Christian Louboutin S.A. v. Yves Saint Laurent America Holdings, Inc.*, 696 F.3d 206 (2d Cir.

2012) (holding that Louboutin's trademark for its red lacquered outsole high heels was valid).[3]

Here, Schluter alleges that "[u]se of the color orange in connection with waterproofing membranes provides no utilitarian advantage to the consumers, is not easier or less expensive to manufacture, nor does it put competitors at a non-reputational advantage if they are not permitted to use it." FAC, ¶ 18. In the parties' discussions, Telos represented that it would change its waterproofing membrane to brown, which suggests that there is nothing particularly important about a waterproofing membrane being orange or that it be a bright color. Even if one could argue that bright-colored waterproofing membranes improve functionality (though there is no indication of this), the court may consider the availability of alternative colors in deciding functionality, and there are "numerous color shades … equally or more visible than" Schluter's orange color. *See Moldex-Metric, Inc. v. McKeon Products, Inc.*, 891 F.3d 879, 887 (9th Cir. 2018).

On a motion for default judgment, the Court may use its discretion in ascertaining the merits of the case, *Aldabe*, 616 F.2d at 1092, and here, the Court finds that Schluter's Orange Mark is not functional and is a valid mark. Thus, the first element of trademark infringement has been satisfied.

> b.   Element Two of the *Rearden* Test: Telos' Use of the Orange Mark was Likely to Cause Consumer Confusion

As to the second element, in evaluating consumers' likelihood of confusion, courts in this district turn to the *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341 (9th Cir. 1979) factors:

---

[3] *Cf.* in *Moldex-Metric, Inc. v. McKeon Products, Inc.*, the Ninth Circuit considered Moldex's trademark for its foam ear plugs which had a bright green color. 891 F.3d 879, 891 (9th Cir. 2018). The district court found that having an especially bright colored earplug is functional because it improves the visibility of the earplug, so that another can confirm that they are in use and granted summary judgment in favor of the defendant based on its finding of functionality. *Id.* at 880-81, 887. The Ninth Circuit remanded stating that the availability of alternative colors should be considered in deciding functionality, and there was evidence supporting that "numerous color shades [were] equally or more visible than [Moldex's] bright green color" which "weighed against a finding of functionality." *Id.*

United States District Court
Northern District of California

(1) the similarity of the marks; (2) the relatedness of the two companies' services; (3) the marketing channel used; (4) the strength of Schluter's mark; (5) Telos' intent in selecting its mark; (6) evidence of actual confusion; (7) the likelihood of expansion into other markets; and (8) the degree of care likely to be exercised by purchasers.

*GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1205 (9th Cir. 2000).  "[T]his eight-factor analysis is 'pliant,' illustrative rather than exhaustive, and is best understood as simply providing helpful guideposts."  *Id*. at 1210 (citations omitted).

### i.     The Similarity of the Marks

The similarity of the marks is perhaps the most important factor and correlates to a likelihood of consumer confusion.  *See Id*. at 1205.  Here, the products are virtually identical.  Thus, this factor strongly weighs in Schluter's favor.

### ii.     The Relatedness of the Two Companies' Services

"Related goods (or services) are those 'which would be reasonably thought by the buying public to come from the same source if sold under the same mark.'"  *Rearden*, 683 F.3d at 1212 (quoting *Sleekcraft*, 599 F.2d at 348, n.10).  "A court may consider the parties to be competitors if they sell goods in the same industry or if their goods are complementary."  *La Terra Fina USA, LLC v. TerraFina, LLC*, 2017 WL 4284167, at *3 (N.D. Cal. 2017).  Here, the parties are direct competitors selling virtually identical flooring membranes used for tile installations.  *See* FAC, ¶ 32.  Thus, the public would reasonably think that orange waterproofing membranes are Schluter's products.  This factor weighs strongly in Schluter's favor.

### iii.     The Marketing Channel Used

"Convergent marketing channels increase the likelihood of confusion."  *Sleekcraft*, 599 F.2d at 353.  "However, this factor becomes less important when the marketing channel is less obscure.  Today, it would be the rare commercial retailer that did not advertise online, and the share use of a ubiquitous marketing channel does not shed much light on the likelihood of consumer confusion."  *Network Automation, Inc. v. Advanced Systems Concepts, Inc.*, 638 F.3d 1137, 1151 (9th Cir. 2011) (citing *Playboy Enterprises, Inc. v. Netscape Communications. Corp.*, 354 F.3d 1020, 1028 (9th Cir. 2004)).  Here, both Schluter and Telos market and promote their products on Amazon.com, among other places.  *See* FAC, ¶¶ 33-34.  Thus, even if this factor

1     weighs in favor of Schluter, it is not of great importance given the ubiquity of internet marketing.

2                          iv.     <u>The Strength of Schluter's Mark</u>

3            "The more likely a mark is to be remembered and associated in the public mind with the

4     mark's owner, the greater protection the mark is accorded by trademark laws." *GoTo.com*, 202

5     F.3d at 1207 (citing *Kenner Parker Toys Inc. v. Rose Art Indus., Inc.*, 963 F.2d 350, 353 (Fed. Cir.

6     1992)).  The Ninth Circuit accounts for circumstantial evidence in this analysis.  *See id.* at 1208

7     (noting that plaintiff's mark has been displayed "many billions of times" and that plaintiff's

8     website had been tremendously successful, rising to the twenty-sixth most visited website on the

9     Internet, which "strengthens [plaintiff's] mark.").  Here, Schluter has been using orange in

10    connection with its products since 1990 and its exhibits show that consumers readily associate

11    orange with its branding.  *See* FAC, Ex C at 4, 6-9; *id.* Ex. D. at 7-8, 16-17, 25-26.  Thus, this

12    factor weighs in Schluter's favor.

13                          v.      <u>Telos' Intent in Selecting Orange for its Product</u>

14           "A relevant intent may be shown 'by evidence that, for example, the defendant knew of the

15    mark, should have known of the mark, intended to copy the plaintiff, failed to conduct a

16    reasonably adequate trademark search, or otherwise culpably disregarded the risk of reverse

17    confusion.'" *Lodestar Anstalt v. Bacardi & Co. Ltd.*, 31 F.4th 1228, 1260 (9th Cir. 2022) (quoting

18    *Marketquest Grp. v. BIC Corp.*, 862 F.3d 927, 934 (9th Cir. 2017)).  In *Reader's Digest Ass'n,*

19    *Inc. v. Conservative Digest, Inc.*, the district court found that the "striking similarity between the

20    trade dress of [the parties' products] is itself probative of intentional copying."  821 F.2d 800, 804

21    (D.C. Cir. 1987) (citing 2 J. McCarthy, Trademarks and Unfair Competition §§ 23:33-23:34 (2d

22    ed. 1984)); *see also Fiji Water Co., LLC v. Fiji Mineral Water USA, LLC*, 741 F. Supp. 2d 1165,

23    1177 (C.D. Cal. 2010) ("The obvious similarity between the [products] supports an inference of

24    deliberate copying.").  Here, Schluter and Telos' products are orange waterproofing membranes,

25    of the same color and function.  The "striking similarity" of these products and their colors "is

26    itself probative of intentional copying" and thus, this favor tips in Schluter's favor.  *See Reader's*

27

28

United States District Court
Northern District of California

*Digest Ass'n*, 821 F.2d at 804.[4]  So is the fact that Schluter has been marketing its orange product for many years and was well known in the industry prior to Telos' entry into the market with its competing product.

vi.    <u>Evidence of Actual Confusion</u>

"[A] showing of actual confusion among significant numbers of consumers provides strong support for the likelihood of confusion." *Network Automation*, 638 F.3d at 1151 (quoting *Playboy*, 354 F.3d at 1026).  Here, Schluter has presented evidence of actual confusion.  FAC, Ex. D. at 7-8, 16-17, 25-26 (in a customer review on one of Telos' products, a customer stated, "They are selling this as Schluter it should be taken out.  They should specify this is not Schluter but an imitation" (cleaned up)); Reply, Ex. B. at 5-7 (in a customer review on one of Telos' products, customers stated "For the price this material [is] inferior to the Schluter product.  My tile contractor had already installed this product before I noticed.  We had some left over Schluter from [a] previous project and [there is a] significant difference. …" "I don't know where I went wrong. I was shopping for the real thing and then I must have saw what I thought was the same product for $20 cheaper and I went for it.  I was buying the 320+ ft roll so the money was only a 6% savings.  I would have not done it. ..."); Madonna Decl. ¶ 6, Docket No. 24 (a Schluter employee stated: "We have received requests from consumers who have purchased non-Schluter product believe it was Schluter product because it was colored orange.").  "Evidence of actual confusion constitutes persuasive proof that future confusion is likely. … If enough people have been *actually* confused, then a *likelihood* that people are confused is established." *Network Automation*, 638 F.3d at 1151 (quoting *Thane Int'l, Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 902 (9th Cir. 2002)).  Thus, this factor weighs in Schluter's favor.

vii.    <u>The Degree of Care Likely to be Exercised by Purchasers</u>

Courts account for the "nature of the particular goods and the relevant consumers" and the degree of care that can be expected from the consumers in a particular market.  *Network*

---

[4] Schluter discusses Telos' conduct during this lawsuit as evidence of its malintent. Mot. at 14. However, bad faith or willful behavior refers to *pre-filing* conduct specific to the infringement of the patent.  Bad faith behavior does not refer to the behavior of the defendant in the litigation process.  *See In re Seagate Tech., LLC*, 497 F.3d 1360, 1374 (Fed. Cir. 2007).

United States District Court
Northern District of California

*Automation*, 638 F.3d at 1152.  "When the buyer has expertise in the field, a higher standard is proper though it will not preclude a finding that confusion is likely.  Similarly, when the goods are expensive, the buyer can be expected to exercise greater care in his purchases; again, though, confusion may still be likely."  *Id.* (quoting *Sleekcraft*, 599 F.2d at 353).  "Low consumer care … increases the likelihood of confusion."  *Network Automation*, 638 F.3d at 1152 (quoting *Playboy*, 354 F.3d at 1028).

The Ninth Circuit has evaluated several cases in which the marketplace was the Internet and has reasoned that "the default degree of consumer care is becoming more heightened as the novelty of the Internet evaporates and online commerce becomes commonplace."  *Network Automation*, 638 F.3d at 1152.  In *Toyota Motor Sales, USA, Inc. v. Tabari*, the Ninth Circuit analyzed whether consumers were likely to be confused that websites owned by non-Toyota affiliated auto brokers, "buy-a-lexus.com" and "buyorleaselexus.com," were in fact affiliated with Toyota, infringing on Toyota's "Lexus" name trademark.  610 F.3d 1171, 1175-76 (9th Cir. 2010).

> The relevant marketplace is the online marketplace, and the relevant consumer is a reasonably prudent consumer accustomed to shopping online; the kind of consumer who is likely to visit the [auto broker's] website when shopping for an expensive product like a luxury car.  *See, e.g., Interstellar Starship Servs., Ltd. v. Epix, Inc.*, 304 F.3d 936, 946 (9th Cir.2002).  Unreasonable, imprudent and inexperienced web-shoppers are not relevant.

*Toyota*, 610 F.3d at 1176.  The court found that consumers who use the internet for shopping typically would know that "a number of sites make nominative use of trademarks in their domains but are not sponsored or endorsed by the trademark holder."  *Id.* at 1178.  These customers "are generally quite sophisticated about such matters and won't be fooled into thinking that[, for example,] the prestigious German car manufacturer sells boots at mercedesboots.com."  *Id.*  The court accounted for the fact that internet consumers often rely on "word of mouth" including "discussion forums, feedback and evaluation website, and the like."  *Id.* at 1178, n.6.  Internet consumers "fully expect to find some sites [or internet products] that aren't what they imagine based on a glance at the domain name or search engine summary."  *Id.* at 1179.  "[C]onsumers don't form any firm expectations about the sponsorship of a website until they've seen the landing

United States District Court
Northern District of California

1    page—if then.  This is sensible agnosticism, not consumer confusion."  *Id*. (citing Jennifer E.

2    Rothman, *Initial Interest Confusion: Standing at the Crossroads of Trademark Law*, 27 Cardozo

3    L.Rev. 105, 122-24, 140, 158 (2005)).

4          Likewise, in *Multi Time Machine, Inc. v. Amazon.com, Inc.*, a brand of military-style

5    wristwatches, called the "MTM Special Ops" sued Amazon.com for trademark infringement,

6    though Amazon did not sell the MTM Special Ops.  804 F.3d 930, 932 (9th Cir. 2015).  Instead,

7    when a user searched for "MTM Special Ops" on Amazon.com, Amazon's search results page

8    populated several other brands of military style watches that Amazon does carry, specifically

9    identified by other brand names.[5]  *Id*.  The Ninth Circuit held that there was no likelihood of

10   confusion because (1) there was no evidence of actual confusion and (2) the other brands were

11   clearly labeled and accompanied by photographs.  *See id*. at 936.  "Because Amazon clearly labels

12   each of the products for sale by brand name and model number accompanied by a photograph of

13   the item, it is unreasonable to suppose that the reasonably prudent consumer accustomed to

14   shopping online would be confused about the source of the goods."  *Id*. at 938.

15         Here, the marketplace is Amazon.com, like in *Multi Time Mach*.  The consumers are

16   relatively sophisticated—they are online shoppers, specifically individuals who specialize in tile

17   construction.  Though Schluter and Telos' products are virtually identical, Telos' products are

18   considerably cheaper than Schluter's.  It is very common for Amazon.com to sell brand names and

19   cheaper knock offs, and a reasonable consumer would likely know this.  Like in *Toyota*, internet

20   consumers "fully expect to find some sites [or internet products] that aren't what they imagine

21   based on a glance at the" product's image.  *Toyota*, 610 F.3d at 1179.  If a consumer was

22   expecting to buy Schluter's product, and they landed on Telos' product page, they would at first

23   notice that the product was significantly cheaper.  A reasonable consumer might notice that the

24   products page does not say Schluter anywhere, and instead says "Telos-Brands" and "Snap

25   Products."  It is also apparent from the product reviews that this is not Schluter's product.

26

27   ─────────────────

28   [5] Because this was not a direct competitor infringement case, the court did not apply the *Sleekcraft* factors, but similarly analyzed likelihood of confusion asking, "who is the relevant reasonable consumer" and "what would he reasonably believe based on what he saw on the screen?"

United States District Court
Northern District of California

This case bears some similarity to *Multi Time Mach*, and a good argument could be made that a reasonable consumer would not confuse the two products.  However, *Multi Time Mach.* is distinguishable, because there is evidence in the instant case of actual consumer confusion, and the products sold are virtually identical.

Thus, this factor weighs in Telos' favor.  However, Schluter has established there was some actual consumer confusion, and thus, Schluter has made a sufficient showing on the merits on this factor.

### 3.    Third Factor: Sufficiency of the Complaint

The complaint here is sufficient.

### 4.    Fourth Factor: The Sum of Money at Stake in the Action

"Default judgment is disfavored where the sum of money at stake is too large or unreasonable in light of defendant's actions.  Conversely, default judgment may be appropriate where it is 'tailored to [the defendant's] specific misconduct.'"  *Tech. LED Intellectual Prop., LLC v. Revogi, LLC*, 2019 WL 2716610, at *4 (N.D. Cal. 2019) (citation omitted).  Here, default judgment is tailored to defendant's specific misconduct of trademark infringement and the damages sought are a fraction of the statutory damages permissible under the Lanham Act for willful trademark infringement.  Thus, this factor does not bar default judgment in this case, but the Court is mindful of it in assessing the damages award.

### 5.    Fifth Factor: The Possibility of a Dispute Concerning Material Facts

Because the Orange Mark is a registered trademark and because the products are virtually the same, it is improbable that Telos could meaningfully dispute that the Orange Mark is invalid or that its products do not infringe.  Mr. Serena represented that Telos was going to change its waterproofing membranes from orange to brown, *see* Hansen Decl., Ex. C-E, Docket No. 24, which indicates that Telos does not dispute that its orange waterproofing membranes infringed on Schluter's Orange Mark.  Thus, the possibility of a dispute concerning the material facts in this case is low.

### 6.    Sixth Factor: Whether the Default was Due to Excusable Neglect

If it is unlikely that Defendant's failure to appear and litigate was based on excusable

19

neglect, this factor favors entry of default judgment.  *See Craigslist, Inc. v. Naturemarket, Inc.*, 694 F. Supp. 2d 1039, 1061 (N.D. Cal. 2010); *Bittorrent, Inc. v. Bittorrent Mktg. GmbH*, 2014 WL 5773197, at *10 (N.D. Cal. 2014) ("it is clear that Defendant's default is not due to excusable neglect, as Plaintiff has served or attempted to serve each filing in this lawsuit on Defendant, and Defendant has actual knowledge of the progress of this action.").  Here it is unlikely that the Defendant's failure to respond to Plaintiff's allegations were the result of excusable neglect, because Telos acknowledged that it was properly served with process and acknowledged receipt of the notice of default judgment.  Thus, this factor weighs strongly in favor of default judgment.

7.      Seventh Factor: the Policy Favoring a Decision on the Merits

The Ninth Circuit has adopted a "strong policy … favoring decisions on the merits." *NewGen, LLC v. Safe Cig, LLC*, 840 F.3d 606, 616 (9th Cir. 2016) (quoting *Eitel*, 782 F.2d at 1471-72).  Here, Telos is fairly on notice of its potential liability, it has failed to otherwise respond to this suit, and Schluter has no other remedy to prevent Telos from infringing upon Schluter's valid Mark.

Thus, because the *Eitel* factors weigh heavily in favor of granting Schluter relief, the Court GRANTS Schluter's Motion for default judgment.

## IV.      **RELIEF**

A.      Standard for Willfulness on Default Judgment

"The general rule of law is that upon default the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true."  *Derek Andrew, Inc. v. Poof Apparel Corp.*, 528 F.3d 696, 702 (9th Cir. 2008) (quoting *TeleVideo Sys., Inc. v. Heidenthal,* 826 F.2d 915, 917–18 (9th Cir.1987)).  District courts have interpreted *Poof* to mean that "[a]n allegation of willful trademark infringement is deemed true on default."  *Yelp, Inc. v. Catron*, 70 F.Supp.3d 1082, 1101 (N.D. Cal. 2014) (quoting *Poof*, 528 F.3d at 702).  Conversely, if there are no factual allegations of willful infringement, only conclusory statements, the district court may decline to find willful infringement on a motion for default judgment.  *See Revogi*, 2019 WL 2716610, at *6.  To find "willful infringement":

"Willful infringement carries a connotation of deliberate intent to

deceive." *Id.*  Generally, "deliberate, false, misleading, or fraudulent ... conduct ... meets this standard." *Id.* (internal quotation marks omitted).  "Willfulness ... 'require[s] a connection between a defendant's awareness of its competitors and its actions at those competitors' expense.'" *Id.* (quoting *ALPO Petfoods, Inc. v. Ralston Purina Co.*, 913 F.2d 958, 966 (D.C. Cir. 1990)).

*Fifty-Six Hope Road Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1074 (9th Cir. 2015).

Additionally, as previously discussed, "[t]he obvious similarity between the [products] supports an inference of deliberate copying." *Fiji Water*, 741 F.Supp.2d at 1177.

Here, Plaintiffs allege:

> 29. Upon information and belief, with full knowledge of Schluter's Orange Mark, Telos chose—out of all the colors in the spectrum—to sell flooring membranes using the color orange.

> 35. Upon information and belief, Telos has purposefully copied the Schluter Orange Mark to unlawfully benefit from Schluter's goodwill in the marketplace.

> 47. Upon information and belief, Telos is using the Orange Mark with full knowledge of the Orange Mark.  As such, its conduct is willful and/or is done with reckless disregard of Schluter's rights.

FAC, ¶¶ 29, 35, 47.  Additionally, Schluter and Telos' products are orange waterproofing membranes, of the same color and function.  The "striking similarity" of these products and their colors "is itself probative of intentional copying."  *Reader's Digest Ass'n*, 821 F.2d at 804. Further, after the FAC was filed, Mr. Hansen sent an email to Mr. Serena following up after a phone call between the parties.  *See* Hansen Decl., Ex. A at 3.  Mr. Hansen stated:

> Thank you for the call this morning.  Below is a list of the items we discussed.
> …
> 2. We understand you were aware of Schluter and its patents previously.

*Id.*  Mr. Serena replied in the affirmative.  *See id.* at 2.  This email communication provides circumstantial evidence that Telos intentionally copied Schluter's Orange Mark.

Based on Schluter's allegations in its complaint, Schluter's long-standing ubiquitous presence in this field, the striking similarity between the two products, the fact that the two products compete directly in the same marketplace, and Mr. Hansen and Mr. Serena's email communications, the Court finds that Telos willfully infringed upon Schluter's Orange Mark.

United States District Court
Northern District of California

B.      Damages Calculation

Under the Lanham Act:

> In a case involving the use of a counterfeit mark … the plaintiff may elect … to recover, instead of actual damages and profits under subsection (a), an award of statutory damages for any such use in connection with the sale, offering for sale, or distribution of goods or services in the amount of—
>
> (1) not less than $1,000 or more than $200,000 per counterfeit mark … or
>
> (2) if the court finds that the use of the counterfeit mark was willful, not more than $2,000,000 per counterfeit mark … as the court considers just.

15 U.S.C. § 1117(c).  Plaintiffs are given the option to elect statutory damages or actual damages. Statutory damages may be preferable because it may be difficult or impossible to prove actual damages or the defendant's profits.  *See* S. Rep. No. 104-177, at 10 (Nov. 28, 1995) ("counterfeiters' records are frequently nonexistent, inadequate or deceptively kept in order to willfully deflate the level of counterfeiting activity actually engaged in, making providing actual damages in these cases extremely difficult if not impossible.  Enabling trademark owners to elect statutory damages is both necessary and appropriate in light of the deception routinely practiced by counterfeiters.").  Here, Telos has stopped responding to Schluter's requests for more information regarding its accounting, and Schluter has thus opted for statutory damages.

The Lanham Act does not provide the Court with guidance as to how to select a damages award within the statutory range; rather, the statute grants the Court with wide discretion, stating the Court may award damages "as the court considers just."  15 U.S.C. § 1117(c).

> In determining the appropriate amount of statutory damages to award on default judgment, courts in this district have considered whether the amount of damages requested bears a "plausible relationship to Plaintiff's actual damages."  While a plaintiff in a trademark or copyright infringement suit is entitled to damages that will serve as a deterrent, it is not entitled to a windfall.

*Yelp*, 70 F.Supp.3d at 1102 (citations omitted).  In awarding profits for trademark infringement, the Ninth Circuit has stated that district courts should *not* impose awards that amount to "little more than nominal damages" because a smaller award "would fail to serve as a convincing

United States District Court
Northern District of California

deterrent." *Playboy*, 692 F.2d at 1274.  "To recover damages after securing a default judgment, a plaintiff must prove the relief it seeks through testimony or written affidavit." *Yelp*, 70 F. Supp. 3d at 1100-01 (quoting *Bd. of Trs. Of the Boilermaker Vacation Trust v. Skelly, Inc.*, 389 F. Supp. 2d 1222, 1226 (N.D. Cal. 2005); *see PepsiCo, Inc.*, 238 F. Supp. 2d at 1175 (citing *TeleVideo Sys., Inc.*, 826 F.2d at 917-18)).  In the end, any "uncertainty in the amount of damages should be borne by the wrongdoer." *Adray*, 76 F.3d at 989.

For guidance, district courts have looked to copyright infringement cases that awarded statutory damages under the Copyright Act.  *See Deckers Outdoor Corp. v. Ozwear Connection Pty Ltd.*, 2014 WL 4679001, at *12 (C.D. Cal. 2014).  The Ninth Circuit has held that, in a Copyright Act case:

> A plaintiff may recover statutory damages "whether or not there is adequate evidence of the actual damages suffered by the plaintiff or of the profits reaped by defendant."  The Supreme Court has stated that "[e]ven for uninjurious and unprofitable invasions of copyright the court may, if it deems it just, impose a liability within [the] statutory limits to sanction and vindicate the statutory policy" of discouraging infringement.

*Peer Intern. Corp. v. Pausa Records, Inc.*, 909 F.2d 1332, 1337 (9th Cir. 1990) (upholding an award of the maximum allowable statutory damages under the Copyright Act even though the plaintiff had only suffered nominal damages).

On default judgment, district courts in this district look to the plaintiff's evidence of actual damages to assess the relative reasonableness of a trademark infringement award, even though plaintiffs on default judgment are unable to conduct discovery of defendant's sales.  *See Microsoft Corp. v. Ricketts*, 2007 WL 1520965, at *4 (N.D. Cal. 2007) (plaintiff only identified three units of counterfeit software that defendant sold, and the court awarded plaintiff $2,000 per infringement recognizing that, while plaintiff was unable to conduct discovery, $3,000,000 in damages would be a windfall).  When plaintiffs only show proof of a few of defendant's sales, district courts limit the damages award to *e.g.* five or ten thousand dollars per infringement, accounting for the defendant's willfulness.  *See Yelp*, 70 F.Supp.3d at 1090 (after plaintiff only demonstrated one sale by defendant, the court awarded plaintiff $5,000 per infringement prior to defendant's receipt of plaintiff's cease-and-desist letter, and $10,000 per infringement after

1  defendant received the cease-and-desist letter); *see also Adobe Systems, Inc. v. Tilley*, 2010 WL

2  309249, at *2 (N.D. Cal. 2010) (after evidence of only one sale by defendant, the court awarded

3  plaintiff $10,000 per infringement).

4           A strong showing of lost sales supports a finding of increased damages.  In *Adobe Systems,*

5  *Inc. v. Taveira*, Adobe claimed that defendants sold counterfeit copies of Adobe's computer

6  software, bearing marks identical to Adobe's registered trademarks.  2009 WL 506861, at *1

7  (N.D. Cal. 2009).  Plaintiff asked the court to award statutory damages of $50,000 per violation

8  for each of five violations of Adobe's marks.  *Id*. at *6.  In plaintiff's complaint, it alleged that

9  defendant had sold more than one thousand unauthorized copies of Adobe software and "e-mail

10  correspondence between the defendants support[ed] an inference that defendants sold most or all

11  of twenty 'items,' that defendant would be listing '20-30 more pieces,' and that defendants

12  intended to continue to make additional sales of software for at least another six months."  *Id*.  The

13  district court found that awarding $50,000 per violation was "reasonable" given that the conduct

14  was intentional and willful, and a significant damages award was necessary to deter a defendant in

15  this context.  *Id*.; *see also Chanel, Inc. v. Doan*, 2007 WL 781976 (N.D. Cal. 2007).

16  C.     Schluter's Damages Calculation

17           Schluter seeks $1,000,000.00 in statutory damages.  *See* Mot. at 18.

18           After the FAC was filed, Jed Hansen, Schluter's lawyer, engaged in communications with

19  James Serena, the (then) CEO of Telos.  *See* Hansen Decl. ¶¶ 4-5.  Mr. Serena communicated to

20  Mr. Hansen that Telos had sold an estimated 9,000 to 10,000 rolls of product from the website.

21  *See id*. ¶ 6; Mot., Ex. C at 3 ("it's looking to be in the range of 9,000-10,000 rolls total, potentially

22  a little shy of that.").  For cost per roll, Schluter submitted a declaration from CJ Madonna, a

23  Schluter employee.  He estimated that Schluter's average profit per Schluter roll sold is

24  approximately $135.00.  Mot. at 6; Madonna Decl. ¶ 4, Docket No. 24.  Mr. Madonna did not state

25  how he came to this calculation.  To calculate its damages, Schluter multiplied 9,000-10,000 rolls

26  X $135.00 = $1,125,000.00-1,350,000.00.  Mot. at 6.  According to Schluter, this amount reflects

27  what Schluter would have made if customers had bought Schluter's products instead of Telos'

28  products.  Schluter has reduced its damages request to $1,000,000.00.

United States District Court
Northern District of California

United States District Court
Northern District of California

Courts in this district have often looked at defendant's profits to ascertain the appropriate damages award.  Schluter has provided several screen shots of Telos' Amazon.com page, which bears Telos' prices.  A Telos waterproof membrane underlayment costs $94.99/ 108sqft grid roll, and $89.99/ 108sqft non-grid roll.  FAC, Ex. D at 1.  A Telos uncoupling membrane underlayment costs $79.99/ 54sqft, $323.99/ 323sqft, *id*. at 9, and $134.26/ 108sqft roll, Mot., Ex. H at 1.  A Telos heated floor uncoupling membrane costs $214.00/ 108sqft roll and $129.99/ 54sqft roll.  FAC, Ex. D at 18.  It seems reasonable that 108sqft is an average sized roll.  The average price point of Telos' 108sqft rolls is therefore $133.31 ((94.99 + 89.99 + 134.26 + 214.00) / 4).  Telos estimated it sold 9,000-10,000 rolls.  Taking the lower estimate of 9,000, multiplied by Telos' average price per roll sold, $133.31, equals $1,199,790.00, which provides a reasonable representation of Telos' revenues from the infringing products.

Though Schluter agrees to reduce the award to $1,000,000, such an award still would be a windfall for Schluter.  *See Yelp*, 70 F.Supp.3d at 1102.  Though there is evidence that some consumers were deceived into thinking that Telos' products were Schluters', there also is evidence that many consumers recognized that Telos' products were not Schluters' and chose to buy them because they were cheaper.  FAC, Ex. D. at 7-8, 16-17, 25-26 (customers left reviews stating: "I've used Ditra [a Schluter product] for years, this works exactly the same, and is made of exactly the same materials. The ONLY difference I can see is that this is cheaper." "I used this like I do the ditraheat uncoupling membrane and it works well." "Similar to Schluter, same thickness, works with cable. Quality slightly less than Schluter. Good for price.").  It cannot be assumed that every sale made by Telos resulted in 1:1 loss in sales for Schluter, especially given the difference in price.  Schluter fails to provide any methodology for determining how much in sales it actually lost to Telos.  *See Yelp*, 70 F.Supp.3d at 1102 (courts may consider plaintiff's actual damages when deciding an award for statutory damages).  As to the measure for Telos' profits, Schluter fails to take into account what portions of the sales were not attributable to Telos' use of the orange color; some portion was likely due to functionality and low price.  Moreover, Schluter takes no account of the costs of production and sales; it only estimates Telos' gross sales, not net profits.

As a measure of appropriate statutory damages, the Court concludes that the best approximation of Telos' profits is closer to $300,000.00 – approximately a quarter of Telos' estimated total revenues from the sale of the infringing product. This award fairly compensates Schluter and serves as a deterrence to Telos for willfully infringing upon Schluter's Orange Mark. *See Taveira*, 2009 WL 506861, at *1. The award also reflects the uncertainties in Schluter's proposed damages award and the caution that should be exercised against large damage awards on default judgment. *See Revogi*, 2019 WL 2716610, at *4 ("Default judgment is disfavored where the sum of money at stake is too large or unreasonable in light of defendant's actions."). Thus, $300,000.00 is an appropriate statutory damages award given the circumstances here.

D.    Attorneys' Fees

The Ninth Circuit has stated that an election to receive statutory damages under § 1117(c) precludes an award of attorneys' fees. *See K & N Engineering, Inc. v. Bulat*, 510 F.3d 1079,1082 (9th Cir. 2007). Schluter acknowledged this rule when it requested attorneys' fees only in the event that the Court does not award Schluter statutory damages. *See* Mot. at 23. Thus, Schluter's request for attorneys' fees is denied.

E.    Joint and Several Liability

Schluter has sued Telos Acquisition and Telos Brands. In Schluter's proposed order granting its motion for default judgment, it proposed that the Court hold Telos Acquisition and Telos Brands jointly and severally liable for its damages award. However, Schluter has not alleged a basis establishing that Telos Acquisition and Telos Brands are jointly and severally liable in this action. Schluter only alleges that Telos Brands owns Telos Acquisition and directs its operations, and that both companies were founded by and are governed and directed by James Serena. *See* FAC at ¶¶ 4-6. Based on this allegation alone, Schluter refers to Defendants as "Telos" or "Defendants" in its FAC and Motion for Default Judgment.

"Courts in the Ninth Circuit have 'held that in patent, trademark … infringement cases, any member of the distribution chain' of allegedly infringing products can be 'jointly and severally liable' for the alleged misconduct." *Adobe Systems, Inc. v. Blue Source Group, Inc.*, 125 F.Supp.3d 945, 973 (N.D. Cal. 2015) (collecting cases). Here, Telos Brands is a member of the

United States District Court
Northern District of California

1    distribution chain of the infringing product.  The Amazon.com retail page for Telos' products lists

2    "Sold by: Telos-Brand."  FAC, Ex. D at 1, 9, 18.  Schluter included as an exhibit a Telos product

3    it bought, and the return address was to Telos Brands.  Mot., Ex. I, Docket No. 24.  Mr. Serena's

4    email address is: serena@telosbrands.com.  *Id*. at Ex. A.  Schluter's cease-and-desist letter was

5    directed via FedEx to Telos Brands, Inc. and via email to info@telosbrands.com.  FAC, Ex. E.

6    With respect to Telos Acquisition, Schluter failed to allege how Telos Acquisition is involved in

7    the distribution chain and how, if at all, it is connected to Telos' infringing behavior.  Nor has

8    Schluter alleged enough to establish alter ego liability (*e.g.* disregard of corporate formalities,

9    under-capitalization of Telos Brands, etc.).

10        Thus, only Telos Brands is liable for the damages award.

11    F.    Injunctive relief

12        A plaintiff seeking a permanent injunction must satisfy a four-factor test before a court

13    may grant such relief.  A plaintiff must demonstrate:

> (1) that it has suffered an irreparable injury; (2) that remedies
> available at law, such as monetary damages, are inadequate to
> compensate for that injury; (3) that, considering the balance of
> hardships between the plaintiff and defendant, a remedy in equity is
> warranted; and (4) that the public interest would not be disserved by
> a permanent injunction.

18    *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006) (citations omitted).  It is clear from

19    the previously discussed factors that this standard is met and that Schluter is entitled to injunctive

20    relief.  There is no evidence that Telos cannot or will not reenter the market so the request for

21    injunctive relief is not moot.  *Rosebrock v. Mathis*, 745 F.3d 963, 971 (9th Cir. 2014) (quoting

22    *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298 (2012) ("The voluntary cessation of

23    challenged conduct does not ordinarily render a case moot because a dismissal for mootness would

24    permit a resumption of the challenged conduct as soon as the case is dismissed.").

25        However, Schluter's proposed order for injunctive relief is too broad.  In *Toyota*, the Ninth

26    Circuit remanded a district court finding of broad injunctive relief in a trademark infringement

27    case.  610 F.3d at 1185.  In that case, Toyota sued an auto broker whose site bore the domain

28    names "buy-a-lexus.com" and "buyorleaselexus.com" stating that the domain names infringed

upon Toyota's "Lexus" name trademark. *Id.* at 1175-76. The district court issued a permanent injunction enjoining the defendant from using "any … domain name, service mark, trademark, trade name, meta tag or other commercial indication of origin that includes the mark LEXUS." *Id.* at 1176. This injunction was too broad. The Ninth Circuit stated:

> A trademark injunction, particularly one involving nominative fair use, can raise serious First Amendment concerns because it can interfere with truthful communication between buyers and sellers in the marketplace. *See Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.,* 425 U.S. 748, 763–64, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). Accordingly, "we must [e]nsure that [the injunction] is tailored to eliminate only the specific harm alleged." *E. & J. Gallo Winery v. Gallo Cattle Co.,* 967 F.2d 1280, 1297 (9th Cir.1992). To uphold the broad injunction entered in this case, we would have to be convinced that consumers are likely to believe a site is sponsored or endorsed by a trademark holder whenever the domain name contains the string of letters that make up the trademark.

*Id.*

Here, Schluter's Orange Mark covers "waterproofing and drainage membranes for use in connection with tile installations." U.S. Patent No. 4,124,207 (filed Apr. 10, 2012), FAC, Ex. A at 1. Schluter's proposed injunction states, among other broad statements: "Defendants … are enjoined from: using in any manner the Orange Mark, in connection with any goods or services in the field of flooring…" Docket No. 24. To enjoin the Defendants from using orange in connection with any goods or services in the field of flooring is too broad when compared with Schluter's trademark. The injunction also prohibits Telos from "otherwise competing unfairly with Schluter in any manner." This statement is overly broad. The Court instead issues a narrowly tailored injunction as stated below.

Plaintiff Schluter Systems, L.P. ("Schluter") brought its Motion for Default Judgment and Permanent Injunction against Defendant Telos Acquisition Company 10, LLC and Telos Brands, Inc. ("Telos") before the Court on Thursday, March 21, 2024, by video conference with the Honorable Edward M. Chen presiding. Having jurisdiction over this suit, having reviewed the moving papers and supporting declarations filed with the Court, and having heard the arguments of counsel,

United States District Court
Northern District of California

1   IT IS HEREBY ORDERED THAT:

2   A.  Default judgment is entered against Telos Brands on all causes of action.

3   B.  Telos Brands, its partners, officers, directors, employees, agents, owners, and

4   representatives and all persons, firms, and corporations in active concert of participation

5   with any of them, are enjoined from:

6       a.  Using in any manner the Orange Mark in connection with waterproofing and

7       drainage membranes for use in connection with tile installations;

8       b.  Using in any manner the Orange Mark, that is confusingly similar to or a colorable

9       imitation of the Orange Mark, in connection with waterproofing and drainage

10       membranes for use in connection with tile installations;

11   C.  Telos Brands shall pay Schluter statutory damages in the amount of $300,000.

13   This order disposes of Docket No. 24.

15   **IT IS SO ORDERED**.

17   Dated: April 16, 2024

20   EDWARD M. CHEN
United States District Judge

29